### MAY et al. v. McGOWAN.
Civ. No. 3904.

United States District Court
W. D. New York.
Dec. 27, 1950.

Moser, Johnson & Reif, Rochester, N. Y., for plaintiffs.

George L. Grobe, U. S. Atty., Buffalo, N. Y. for defendant; Austin J. Donovan, Asst. U. S. Atty., Rochester, N. Y., Theron Lamar Caudle, Asst. Atty. Gen., Andrew D. Sharpe, Clarence J. Nickman, Sp. Assts. to Atty. Gen., of counsel.

BURKE, District Judge.

This is an action to recover the amount paid as a deficiency assessment of an estate tax involving the value for estate tax purposes of 500 shares of capital stock of H. H. Babcock & Co., Inc., owned by the decedent at the time of his death, May 12, 1945. Prior to 1926 the decedent was engaged in the business of selling coal and coke under the assumed name of H. H. Babcock & Co., of which he was the sole owner. In 1927 Harry A. May, his son, one of the plaintiffs, started to work for his father in the business. In 1929 they formed a partnership as equal partners to carry on the business. When the partnership was formed the decedent was indebted to the Lincoln-Alliance Bank on short-term promissory notes totaling $182,001.42. This indebtedness was the result of borrowings of the decedent from the bank over a period from 1926 to 1929 for his own personal use not in connection with the business. In February, 1936 the decedent and his son organized a corporation, H. H. Babcock & Co., Inc. In consideration of the transfer of partnership assets to the corporation the corporation assumed all of the partnership liabilities, including the amount owed the bank on notes, and issued 500 shares of capital stock to the decedent and to his son. This was the total capital stock of the corporation. The bank demanded from the decedent and his son a written guarantee of payment of all obligations of the corporation. The decedent and his son on April 7, 1936 delivered to the bank, on its demand, a written guarantee of payment of all obligations of the company then existing or thereafter incurred, to an amount not exceeding $161,-500. On the same day the decedent and his son entered into a written agreement which recited that among the liabilities assumed by the corporation was a certain partnership note indebtedness in the aggregate principal sum of $161,500 to the bank, which debt was incurred by the decedent before his son became a member of the partnership, and that as between the decedent and his son the decedent assumed liability for the debt. The agreement provided that neither decedent nor his son could sell his stock to an outsider without first offering to sell to the other. Upon the death of either, the other was to have the right to purchase all or any of the shares owned by the one who should die at $100 per share, except that in case of a purchase by the son, the purchase price per share was to be reduced by 1/500 of the principal amount of the bank debt remaining unpaid at that time. The agreement recited that the son was unwilling to guarantee payment to the bank of the debt which as between decedent and his son was the personal obligation of the father, unless special provision was made as to the purchase price of any shares purchased by the son in case of his father's death. On May 12th, 1945, when the decedent died, the indebtedness to the bank was $90,-707.50.

The question to be determined is the fair market value for estate tax purposes of the stock owned by the decedent at the time of his death. Section 81.10 of Treasury Regulations 105 relating to the estate tax under the Internal Revenue Code. The Commissioner of Internal Revenue in assessing the deficiency valued the stock at $100 per share. The plaintiffs contend that the tax should be valued according to the

agreement between the decedent and his son. If they are right that would result in zero valuation of the stock for estate tax purposes.

The first inquiry should be whether the stock was subject at the time of the decedent's death to an enforceable option to buy at a specific price. If so the fair market value could not exceed the option price. The stock was subject on the death of the decedent to the right of the son to purchase at the price fixed in the agreement, viz. $100 per share, less 1/500 of the principal amount of the bank debt remaining unpaid at that time. Since the bank debt was then $90,707.50, the son was entitled under the contract to get the stock for nothing. That was the fair market value of the decedent's stock at his death for estate tax purposes. Wilson v. Bowers, 2 Cir., 57 F.2d 682; Lomb v. Sugden, 2 Cir., 82 F.2d 166. It would require far more temerity than I possess to hold with the Government's contention that the Wilson and Lomb cases (both decisions of the Court of Appeals for the Second Circuit) are plainly outmoded and have no remaining vitality. If those cases are to be discarded it would seem to be the more prudent course to await the unequivocal word of that Court, or a higher one.

But, the Government says, the debt referred to in the agreement was fully discharged long before the date of the agreement. If that may be said to be so it could only mean that partnership funds arising out of the business had been used to discharge the personal obligation of the decedent. The Government admits there is no evidence of a tax avoidance purpose here. As between the decedent and his son the debt was recognized in April, 1936 as the decedent's personal obligation. The option accorded the son by the agreement was a concession to secure his guarantee of the payment of this mutually recognized personal obligation of the decedent. Its validity as an option at a specific price enforceable as such at the decedent's death is not dependent on whether the debt can be said to have been technically discharged some years prior to the agreement, but on whether the agreement was supported by a valid consideration. The mutual covenants of the agreement furnished such consideration.

The Government also urges that the agreement amounted to a testamentary disposition without full and adequate consideration and therefore is invalid for federal estate tax purposes under Section 811(c) of the Internal Revenue Code as enacted March 3, 1931, 26 U.S.C.A. § 811(c). The argument is that, even assuming the doctrine of the Lomb and Wilson cases remains unimpaired, the Commissioner's determination fixing the value of the stock at $100 gave effect to the rule of those cases except to the extent that the agreement amounted to a testamentary disposition without full and adequate consideration. It stresses that both those cases dealt with interests of decedents who died prior to the 1931 amendment and with agreements entered into before the amendment, and that there was therefore no need for the Court to consider adequacy in money or moneys worth for the consideration of the agreements in those cases. In 1931 the statute was amended to define a transfer in contemplation of death, or intended to take effect at death, as including a transfer by a decedent during his lifetime without adequate consideration in money or moneys worth, if the decedent retains during his life possession or enjoyment of the property or the right to the income therefrom, or the right to designate the persons to receive the income. So, the Government says, the valuation of the stock concerns not only the interest in the shares which the decedent retained but also the interest represented by the option.

If the language of the amendment was intended to mean that an agreement giving a right to purchase stock at a stipulated price is a transfer of an interest in the stock, it left much for tenuous rationalizing to bring it within its scope. Interest is defined in Webster's New Collegiate Dictionary (copyright 1949, by G. and C. Merriam Co.,) as a right, title, or share in a thing, participation in advantage, profit and responsibility. What an optionee gets is a right to purchase, a right to exercise a privilege, which he may never see fit to ex-

ercise. He is left with a choice of purchasing or not, but until he does he has no right to participate in the benefits attaching to the stock. A valid unexercised option does not constitute an interest in the property. Helvering v. San Joaquin Fruit & Investment Co., 297 U.S. 496, 56 S.Ct. 569, 80 L.Ed. 824. The same case admonishes that language used in a tax statute shall be read in the ordinary and natural sense. The amendment was designed to overcome the effect of the decision in May v. Heiner, 281 U.S. 238, 50 S.Ct. 286, 74 L.Ed. 826, where trust property was held not to be includible in gross estate of a decedent, because nothing passed at her death, title to the trust property having been definitely fixed by the trust deed. It calls for captious reasoning to extend it to cover a situation like the instant case. The Government refers to dicta in Hoffman v. Commissioner, 2 T.C. 1160, 1176 as supporting its view. In that case the Tax Court drew the distinction between a bona fide contract, based upon an adequate condition, to sell property for less than its value, in which case the contract may fix the value for estate tax purposes, and a mere gratuitous promise to permit some favored individual, particularly the natural object of the bounty of the promisor, to purchase it at a grossly inadequate price, where it could have no such effect. Clearly the present case involved no mere gratuitous promise. In Estate of Armstrong v. Commissioner, 7 Cir., 146 F.2d 457, also cited by the Government, the taxpayer, without having advanced the contention in the Tax Court, contended in the Court of Appeals that the case (involving an option to purchase stock) was governed by the Wilson and Lomb cases. The Court held that, had the petitioner advanced the theory in the Tax Court that the value of the stock was reduced by the outstanding option, the Tax Court might well have considered it and perhaps have been persuaded to reduce the Commissioner's determination of the value of the stock for inclusion in the gross estate. Neither Bensel v. Commissioner, 36 B.T.A. 246, 252, nor the decision of the Circuit Court of Appeals affirming it, 3 Cir., 100 F.2d 639, support the Government's contention.

Judgment for plaintiffs.

### Findings of Fact.

1. On June 21, 1946 an adjustment was made by the Commissioner of Internal Revenue increasing the valuation of decedent's interest in 500 shares of stock of H. H. Babcock & Co., Inc. from zero, as shown in the estate tax return, to $50,000, thus increasing the amount of the estate tax. The increase attributable to the changed valuation of the stock amounted to $13,727.62, representing a tax of $13,392.80 and interest in the amount of $334.82. The tax was paid.

2. On April 7, 1947 the plaintiffs filed a claim for refund. The Commissioner failed to take Administrative action on the claim for refund within six months after filing. Neither the said sum nor any part thereof has been refunded.

3. For some years prior to 1926 the decedent, Albert E. May, was engaged in the sale of coal and coke under the assumed name of H. H. Babcock & Company. He was the sole owner thereof.

4. During the period between 1926 and 1929 the decedent borrowed extensively from the Lincoln-Alliance Bank, giving short-term promissory notes and pledging his own securities as collateral. On October 17, 1929 the principal of the indebtedness amounted to $182,001.42. The borrowings were for the decedent's own personal use and were not connected with the coal business.

5. In April, 1927 Harry A. May, the decedent's son, one of the plaintiffs, entered the employment of his father in the coal business. On or about October 17, 1929 the decedent and Harry A. May became equal partners in the business of H. H. Babcock & Company. At that time the indebtedness to the bank still amounted to $182,001.42.

6. In February, 1936 the decedent and Harry A. May organized a New York corporation under the name of H. H. Babcock & Co., Inc. On or about February 22, 1936

the Board of Directors of the corporation accepted an offer by the two partners to transfer all the assets of the partnership to the corporation. The consideration for the transfer was the assumption by the corporation of all the liabilities of the partnership, direct or contingent, including the bank indebtedness, and the issuance to each of the two partners of 500 shares of the capital stock of the corporation. That was the total capital stock.

7. On February 22, 1936 the bank indebtedness amounted to $163,534.31. The debt had fluctuated in amount during the period between October 17, 1929 and February 22, 1936, but in general had continued at a level exceeding $165,000. It never fell below $50,000 except for a period of five days in November, 1930, when it dropped from $139,000 to $45,759.73 and five days later rose to over $198,000.

8. The bank demanded that the decedent and Harry A. May guarantee the corporate indebtedness. Pursuant to that demand the decedent and Harry A. May executed and delivered to the bank an agreement guaranteeing payment of all obligations of the company then existing or thereafter incurred to an amount not exceeding $161,500. The agreement expressly acknowledged that the indebtedness to the bank had been incurred by the decedent before Harry A. May became a member of the partnership, and the parties to the agreement mutually agreed that the decedent was liable for the said indebtedness as between the two parties. It was recited in the agreement that the bank as a condition to its acceptance of the liability of the corporation for the indebtedness, had demanded that the two parties executed a guarantee thereof and pledge as security therefor their shares of stock of the corporation. It was recited that each of the two parties desired to avoid a division of the control of the corporation between himself and a person not then a stockholder. Each of the parties agreed that he would not sell his stock during the lifetime of the other party without first offering to sell it to the other party. It was agreed that, upon the death of either party the other would have an irrevocable option to pur-

chase the stock of the one who died. All options and rights were to be subject to the pledge of the shares to the bank, and any purchase of shares under the option agreement was to be consummated by an assignment of shares rather than by a delivery of shares, if they were then in possession of the bank. The purchase price at which stock was to be offered by a party desiring to sell, and the option price effective upon the death of a party, was to be $100 a share, except as hereinafter noted. A concession in price was made to Harry A. May by reason of his unwillingness to guarantee the bank indebtedness otherwise. The price per share at which stock was to be offered to him by Albert E. May, should Albert E. May desire to sell, and the option price per share at which Harry A. May had the irrevocable right to purchase upon the death of Albert E. May was $100, less 1/500 of the amount of the bank indebtedness remaining unpaid at the time. In consideration of that concession in price Harry A. May agreed to execute a guarantee of the bank indebtedness. This agreement was entered into in good faith and without a tax avoidance purpose.

9. On or about April 7, 1936 the decedent and Harry A. May duly executed and furnished to the bank, on its demand, a written, joint and several payment of all indebtedness of the corporation to an amount of $161,500, with interest thereon and all expenses of collection. On April 7, 1936 the bank indebtedness amounted to $163,409.86. On April 8, 1936 it amounted to $161,049.44.

10. On the date of the decedent's death, May 12, 1945, the indebtedness was $90,-707.50.

## Conclusions of Law.

1. The agreement of April 7, 1936 was a binding, specifically enforceable agreement. The consideration for the agreement was the mutual covenants expressed in the agreement.

2. The market value of decedent's interest in the stock of H. H. Babcock & Co., Inc. was the fair market value thereof at the time of his death. The fair market value of the decedent's interest in the stock at the time of his death could not be in

excess of the price at which Harry A. May had the right to demand transfer thereof to him under the agreement of April 7, 1936. That price was zero.

3. The plaintiffs are entitled to judgment against the defendant in the amount of $13,727.62, with interest at 6%, from January 9, 1947, together with costs.