T.C. Memo. 1997-195


UNITED STATES TAX COURT



ESTATE OF PAUL E. BROWN, DECEASED, PETER D. BROWN
AND MICHAEL BROWN, CO-EXECUTORS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 13081-95.                 Filed April 28, 1997.


James L. Malone III, Thomas C. Borders, and Carol A.
Harrington, for petitioner.

James E. Kagy and Joseph P. Grant, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, Judge:  Respondent determined a deficiency in
petitioner's estate tax of $29,885,493.

Paul Brown was the chief operating officer of the Cincinnati Bengals from 1967 to 1991. In 1983, he sold 117 of his 118 shares of Bengals stock to John Sawyer, who owned 213 shares of Bengals stock. In exchange, Sawyer gave a $3.51 million note to Brown and sold an option to Brown's sons to buy up to 329 shares of Bengals stock; i.e., the 117 shares Brown sold to Sawyer and 212 of Sawyer's shares. The option could be exercised from 1993 to 1996. Paul Brown died in 1991. His sons exercised the option in 1993 for 329 shares of stock. On Paul Brown's Federal estate tax return, petitioner reported that Brown owned one share of Bengals stock when he died. Respondent determined that his estate includes 329 shares of Bengals stock. Respondent now contends that Paul Brown's estate includes 312 shares of Bengals stock.[1]

The issue for decision is whether Paul Brown's estate includes 312 shares of Bengals stock, as respondent contends, or one share, as petitioner contends. We hold that decedent's estate includes one share of Bengals stock.

Section references are to the Internal Revenue Code of 1986. Rule references are to the Tax Court Rules of Practice and Procedure.

---

[1] We explain respondent's contention that Brown's estate includes 312 shares of Bengals stock at p. 33 below.

TABLE OF CONTENTS

Findings of Fact                                                    Page

A.   Paul Brown . . . . . . . . . . . . . . . . . . . . . . . . 3
B.   Origins of the National Football League . . . . . . . . . 4
C.   Cincinnati Professional Football Franchise . . . . . . . . 6
D.   Developments Affecting the NFL and the Bengals in 1982 . 14
E.   1983 Agreements Between Paul Brown and Sawyer . . . . . 19
F.   NFL Constitution and Bylaws Relating to a Sale of an
     Interest in an NFL Team . . . . . . . . . . . . . . . . 26
G.   Brown Family Limited Partnership . . . . . . . . . . . . 27
H.   Paul Brown's Will . . . . . . . . . . . . . . . . . . . 32
I.   NFL Approval of the Transfer of Bengals Stock From
     Sawyer to Brown Family Members . . . . . . . . . . . . . 32
J.   1993 Escrow Agreement . . . . . . . . . . . . . . . . . 33
K.   Valuation Issues . . . . . . . . . . . . . . . . . . . . 33


Opinion

A.   The Positions of The Parties . . . . . . . . . . . . . . 34
B.   Section 2036 -- Background . . . . . . . . . . . . . . . 35
C.   Whether Paul Brown Received Adequate and Full
     Consideration for the Shares of Bengals Stock . . . . . 37
D.   Whether Decedent Made an Inter Vivos Transfer of
     Sawyer's 212 Shares of Bengals Stock . . . . . . . . . 38
E.   Whether Paul Brown Retained an Interest in the 329
     Shares of Bengals Stock Which Were Subject to the
     1983 Agreement . . . . . . . . . . . . . . . . . . . . . 40
F.   Respondent's Substance Over Form Theory . . . . . . . . 40
G.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . 48

FINDINGS OF FACT

A.   Paul Brown

Paul Brown was born on September 7, 1908, and died on August 5, 1991. He lived in Ohio when he died. His sons Peter and Mike Brown are the coexecutors of his estate and lived in Ohio when the petition in this case was filed.

Paul Brown was a native of Massillon, Ohio. He played high school football there and at Miami University of Ohio. Brown coached football at Massillon High School from 1932 to 1941. The

team's record during those years was 96 wins, 9 losses, and 3 ties.  In 1941, Brown became the head football coach at Ohio State University, which won the national championship that year. He coached at Ohio State again in 1942 and 1943.  For the 1944 and 1945 seasons, Brown coached the military service football team at the Great Lakes (Illinois) Naval Training Station.

B.    Origins of the National Football League

       1.    The American Professional Football Association

The American Professional Football Association (APFA) began business in 1920.  There were 10 charter franchises.  The organizational meeting in Canton, Ohio, included the Decatur Staleys (later, the Chicago Bears), Cleveland Indians, Dayton Triangles, Akron Professionals, Massillon Tigers, and several other teams.  The APFA changed its name to the National Football League (NFL) in 1922.  Eventually, most NFL teams settled in large metropolitan areas.

       2.    The All-American Football Conference

The All-American Football Conference (AAFC) was founded immediately after World War II.  This league included the Cleveland Browns.

The Cleveland Browns were named after Paul Brown.  Brown was the head coach and general manager of the Cleveland Browns from 1946 to 1962.  He spoke for the Browns at NFL meetings and controlled the team's operations.

The Cleveland Browns won all four AAFC league championships from 1946 to 1949.  The AAFC stopped operating after the 1949 season.  Three AAFC teams (Cleveland, San Francisco, and Baltimore) joined the NFL beginning in the 1950 season.  The Cleveland Browns won the NFL championship in 1950, 1954, and 1955, and lost championship games in 1951, 1952, 1953, and 1957.

Art Modell (Modell) and a group of investors, including Paul Brown as a minority investor, bought the Cleveland Browns in 1961.  Modell tried to undermine Brown after the Modell group bought the Cleveland Browns.  Modell fired Paul Brown in 1963.  Brown moved to California for a short retirement.

3.   The American Football League

The American Football League (AFL) was founded in 1959.  The AFL generally established franchises in cities where the NFL did not have teams.

The AFL operated as a separate football league from 1960 to 1969.  The AFL and NFL drafted and competed for the same players, which led to higher player costs for AFL and NFL teams.  The AFL and NFL also competed for advertising dollars and television audiences.  The AFL secured a 5-year, $136 million television contract from NBC for its 1965 season, which gave it a substantial economic boost.

4.   Merger of the NFL and AFL

On June 8, 1966, the AFL and NFL announced that they would merge.  The agreement provided that AFL and NFL teams would

compete against each other as members of the NFL beginning in 1970.

The NFL decided to add a team for the 1967 season in New Orleans.  The AFL decided to expand to one other U.S. city for the 1968 season.

    5.    NFL Control Person Policy

Since the 1920's, the NFL has encouraged each of its teams to be controlled by one person.  In the few teams where no one had majority ownership, the league encouraged the franchise to designate one individual (known as the control person) to represent the franchise in league matters.  The league encouraged owners of those teams to use devices such as voting trusts to establish a control person.

C.    Cincinnati Professional Football Franchise

    1.    Actions Preceding Formation of the Cincinnati Bengals

From the time Paul Brown left Cleveland, he and his son, Mike, began to seek opportunities for him to return to the NFL. Paul Brown wanted to be an owner of a team, not just a coach. Because of his experiences in Cleveland, Paul Brown did not want to return to professional football unless he was the control person.

Paul and Mike Brown wanted to get an NFL franchise for Cincinnati.  Mike Brown did a survey which showed that Cincinnati would be an excellent location for a professional football team

based on income levels, population within 100 miles, and the fact that Cincinnati is an area of proven football interest.

Paul Brown met John Sawyer (Sawyer) through a mutual friend, Dr. William Hackett (Hackett). Sawyer owned Orleton Farms in London, Ohio. Sawyer decided to invest in a professional football team in Cincinnati with Brown. Sawyer highly valued Brown's experience and prior NFL success.

2.    Ohio Valley Sports (OVS)

Mike Brown, Hackett, and Sawyer formed Ohio Valley Sports, Inc. (OVS), an Ohio corporation, on December 12, 1965, to acquire, develop, and operate a professional football team.

In 1966, Commissioner Pete Rozelle (Rozelle) and members of the AFL's expansion committee visited Cincinnati to meet with Paul Brown. At Rozelle's urging, they recommended that the AFL award a franchise in Cincinnati to OVS.

On May 24, 1967, the AFL awarded a new franchise to OVS. The team was to be called the Cincinnati Bengals (Bengals). Paul Brown's contacts and participation were critical to the effort to obtain the franchise.

On September 26, 1967, OVS was recapitalized. Paul Brown, Sawyer, and nine other investors contributed $2 million in exchange for 1,000 shares of OVS stock with a per share price of $2,000. These shares were held as follows:

| Name | Shares |
|------|--------|
| Paul Brown | 100 |
| John Sawyer | 200 |
| J. Barrett Buse | 45 |
| Raymond L. Buse | 45 |
| Enquirer Enterprises, Inc. | 109 |
| David G. Gamble | 33 |
| William Hackett | 80 |
| Austin Knowlton | 300 |
| Louis Nippert | 10 |
| James Williams | 33 |
| William S. Williams | 45 |
| Total | 1,000 |

Sawyer was president of OVS. Paul Brown was vice president, general manager, and head coach. Mike Brown was assistant general manager and in-house legal counsel. Sawyer had four children, but they were not involved in running the Bengals.

3. 1967 Voting Trust Agreement

OVS had no majority shareholder when it obtained the Bengals franchise. Because of the NFL's control person policy, the OVS shareholders designated a shareholder to serve as the control person.

On September 26, 1967, the OVS shareholders entered into a voting trust agreement (1967 voting trust), which named Paul Brown as the voting trustee and control person for a term not to exceed 10 years, beginning October 16, 1967. The voting trustee had the right to exercise all shareholders' rights and powers, including the right to vote the stock and to take part in or consent to any corporate or shareholders' action. The right to vote included the right to vote to elect directors, and to vote

for or against any resolution or proposed action which required shareholders' consent. The voting trustee had the right to amend the certificate of incorporation and to mortgage or pledge all or part of the property of OVS. The voting trustee had no authority to change the terms of his employment contract, to sell, pledge, hypothecate, mortgage or place a lien or charge on the stock, to sell all or substantially all the assets of OVS, or take any action to dissolve, consolidate, merge, reorganize or recapitalize OVS.

4. Riverfront Stadium

Cincinnati was required to build a new stadium before the NFL would award a franchise to that city. This new stadium, Riverfront Stadium, opened for the 1970 season and has served as the stadium for the Bengals and the Cincinnati Reds baseball team until the time of trial. Riverfront Stadium is one of the smallest stadia in the NFL. During the overlap of the baseball and football seasons, it seats about 55,000. After the baseball season, it seats about 60,000. Riverfront Stadium does not have skyboxes or luxury boxes.

5. Formation of the Cincinnati Bengals, Inc.

On December 14, 1967, OVS changed its name to the Cincinnati Bengals, Inc. Sawyer was president of the Bengals from 1967 to 1994. Paul Brown was vice president, general manager, and chief operating officer of the Bengals from 1967 until he died in 1991.

He was head coach from 1968 to 1975.  In 1967, Mike Brown became secretary and James R. Williams became treasurer.

On April 28, 1970, the Bengals' shareholders extended the 1967 voting trust to April 27, 1980.  In 1973, each Bengals shareholder exchanged his stock for stock in OVS-Del., a Delaware corporation, and extended the 1967 voting trust agreement without change, except that Mike Brown was named successor voting trustee.

The Bengals began to play in the AFL in 1968.  When the NFL and AFL merged for the 1970 season, Cincinnati, Pittsburgh, Cleveland, and Houston became members of the Central Division of the American Football Conference (AFC) of the NFL.

The Bengals lost money in 1968 and 1969.  They did not receive any national TV contract money during these seasons.  They played at Nippert Stadium in Cincinnati, which had a capacity of only about 30,000.

The Bengals won their AFC division in 1970.  From 1968 to 1990, the Bengals had 171 wins, 168 losses, and one tie.

6.  Sales, Redemptions, and Transfers of Bengals Stock from 1977 to 1980

Several shares of OVS-Del. stock were redeemed or sold in arm's-length transactions from 1977 to 1979.  The price per share increased gradually from $14,828.13 (in 1977) to $24,000 (in 1979) in these transactions.  On August 4, 1980, OVS-Del. redeemed 110 shares of its stock owned by Sawyer for all of the

shares of Rosemoor Farms, Inc., a 1,000 acre farm located near Jamestown, Ohio, that OVS-Del. bought in August 1974. On September 27, 1979, Paul Brown transferred one share of OVS-Del. stock to each of his sons Mike and Peter. As a result, on October 23, 1980, the stock of OVS-Del. was held as follows:

| Name | Shares | % |
|------|--------|---|
| Paul Brown | 118 | 20.1 |
| Mike Brown | 1 | 0.17 |
| Peter Brown | 1 | 0.17 |
| David G. Gamble | 1 | 0.17 |
| Austin Knowlton | 249 | 42.5 |
| Louis Nippert | 1 | 0.17 |
| John Sawyer | 213 | 36.5 |
| James R. Williams | 1 | 0.17 |
| William J. Williams | 1 | 0.17 |
| Total | 586 | 100.00 (100.12%) |

7.   The Bengals' Dividend Payment History

The Bengals paid no dividends from 1968 to 1976 because Paul Brown believed that it was essential to increase the Bengals' reserves. Beginning in 1976, OVS-Del. or the Bengals paid dividends as follows:

| Year | Dividends Per Share | Total Amount of Dividends Paid |
|------|--------------------|-------------------------------|
| 1976 | $10 | $9,900 |
| 1977 | 300 | 297,000 |
| 1978 | 360 | 320,330 |
| 1979 | 0 | 0 |
| 1980 | 500 | 348,000 |
| 1981 | 20 | 11,720 |
| 1982 | 10 | 5,860 |
| Total | 1,200 | 992,810 |

From 1977 to 1980, OVS-Del. used $8,162,860 of its corporate reserves to fund the stock repurchases described above (see par.

C-6). Thus, from 1976 to 1980, OVS-Del. used $9,155,670 of its corporate reserves to pay dividends and to repurchase stock.

8. 1980 Shareholder Agreements

On October 24, 1980, the OVS-Del. shareholders merged OVS-Del. into the Cincinnati Bengals, Inc. The Bengals were the surviving corporation. Also on that date, the Bengals' shareholders entered into a 10-year irrevocable voting trust agreement which provided in part as follows: (a) Paul Brown was appointed the sole voting trustee; (b) if he died, resigned, or became incapacitated, Mike Brown would be the successor trustee; (c) if Mike Brown died, resigned, or became incapacitated while serving as successor trustee, the voting trust would terminate; (d) the trustee could, subject to the provisions of the 1980 voting trust, exercise all shareholders' rights and powers in all common stock (including the right to mortgage or pledge all or part of the property of the Bengals); (e) the trustee had no authority to sell, pledge, mortgage, or place a lien or charge on Bengals stock, sell all or substantially all of the Bengals' assets, or dissolve or merge the Bengals; and (f) a sale of all or substantially all of the Bengals' assets, or its dissolution or merger, must be approved by a two-thirds vote of the shareholders, which must include the affirmative vote of the shares the voting trustee owned in his individual name.

Also on October 24, 1980, Paul and Mike Brown and Sawyer entered into an option agreement regarding Paul Brown's and

Sawyer's stock. Sawyer and Paul Brown entered into the 1980 option agreement to give each of them a chance to obtain a majority interest in the Bengals if the other died. Neither wanted any other Bengals shareholder to gain control.

The 1980 option agreement provided in part as follows: (a) Paul Brown received an option to buy Bengals stock owned by Sawyer at Sawyer's death; (b) Paul Brown's option was not assignable except to Mike Brown; (c) if Paul Brown died before Sawyer, Mike Brown could exercise the option; (d) Sawyer received an option to buy the stock Paul Brown owned when he died if Sawyer survived Brown, and if such shares would not pass to Mike or Peter Brown under Paul Brown's will or under State law applicable to the distribution of the assets of Paul Brown's estate; (e) Sawyer's option from Paul Brown was not assignable by him and terminated when he died; and (f) the price of each share of stock bought under the option was initially set at $28,735.63, and was to be adjusted each March by Paul Brown and Sawyer.

The price of stock under the 1980 option agreement was set as follows:

| Date Price Set | Price Per Share |
| --- | --- |
| Oct. 24, 1980 | $28,735.63 |
| Mar. 16, 1981 | 28,735.63 |
| Mar. 23, 1982 | 45,000.00 |
| Mar. 22, 1983 | 45,000.00 |

Paul and Mike Brown and Sawyer canceled the 1980 option agreement on May 16, 1983.

D.   Developments Affecting the NFL and the Bengals in 1982

    1.   Television and Radio in 1980 and 1981

NFL television ratings for the 1980 season were the second best in history, exceeded only in 1976.  Ratings for all three major networks were higher in 1980 than in 1979.

In the 1981 season, the NFL had its best year in regular season combined television ratings.  Both ABC and CBS had record high ratings.  The NFC playoff game between Dallas and San Francisco had a record rating for a Conference championship game and was the eighth most watched sports event in history.

Television ratings dropped in the 1982 season from the 1981 season for two of the three major networks, as shown below:

### Television and Radio Ratings

Audience Size
(millions)

|                     | 1979 | 1980 | 1981 | 1982 |
|---------------------|------|------|------|------|
| NBC-TV              | 14   | 15   | 13.9 | 13.9 |
| CBS-TV              | 15   | 15.3 | 17.5 | 16.5 |
| ABC-TV Monday Night | 19.6 | 20.8 | 21.7 | 20.6 |
| CBS-Radio           |      | 7    |      | 8    |

In March 1982, NFL Commissioner Rozelle announced a new television contract between the NFL and NBC, CBS, ABC, and ESPN for the 1982-86 seasons.  This agreement increased each NFL team's shared television revenues from $5,465,000 in the 1981 season to a projected $17.5 million in the 1986 season.  The agreement provided that a team would not receive national television revenue for games not played because of a strike.

2.  Game Attendance

The Bengals were not as successful after Paul Brown stopped coaching in 1975.  The team's record was 4-12 in both 1978 and 1979.  In 1980, the Bengals had a 6-10 record and finished last in their division.  This poor performance hurt the Bengals' season ticket sales and attendance.  From 1978 to 1980, the Bengals' season ticket sales dropped from 43,712 to 38,527.

In 1981, the Bengals played in the Super Bowl for the first time.  In 1982, the Bengals finished second in their division with a record of 7-2, and lost in the first round of the playoffs.  Season ticket sales and attendance improved in the early 1980's.  Season ticket sales increased to 48,273 in 1982.

The NFL set attendance records in 1979, 1980, and 1981.  Attendance dropped in 1982 because of the players' strike.  NFL game attendance in those years was as follows:

### NFL Game Attendance

|  | 1979 | 1980 | 1981 | 1982 |
|---|---|---|---|---|
| NFL |  |  |  |  |
| Total | 13,182,039 | 13,400,000 | 13,606,990 | 7,367,438 |
| Average | 58,848 | 59,787 | 60,745 | 58,472 |
| % of Stadium Capacity |  | 92.4% | 93.8% |  |
| Bengals |  |  |  |  |
| Average |  | 49,657 | 54,900 | 57,397 |

NFL gate receipts are shared as follows:  66 percent to the home team (15 percent of which is to pay stadium rent and day-of-

the-game expenses), and 34 percent to the visiting team. Skybox revenues are not shared with other teams. A team can earn millions of dollars from skyboxes.

3. Los Angeles Memorial Coliseum Commission v. NFL

In early 1980, Al Davis (Davis), the general partner of the Oakland Raiders ownership group, sought to move that team to Los Angeles. The other 27 NFL owners opposed the Raiders' move.

In 1980, a suit entitled Los Angeles Memorial Coliseum Commission (LAMCC) v. National Football League was pending in the Federal District Court in Los Angeles. LAMCC filed that suit when the Rams left the Los Angeles Memorial Coliseum to play in Anaheim.

On March 25, 1980, Davis filed a $160 million antitrust suit against the NFL and joined that suit to LAMCC v. NFL, supra. The District Court set a jury trial to hear LAMCC's and the Raiders' claims of antitrust violations by the NFL. The existence of the litigation was disclosed in the financial statements of the Cincinnati Bengals, Inc., for the fiscal year ending February 28, 1982, which described the suit and contained the following statement:

> In the opinion of management and legal counsel, the damages alleged by this complaint against the NFL and its member clubs are greatly overstated. The effect of the final outcome of this litigation on Cincinnati Bengals, Inc. is not determinable at present.

On May 7, 1982, the jury returned a liability verdict against the NFL in LAMCC v. NFL. On June 14, 1982, the District

Court issued its written judgment on the liability issue. The NFL appealed. As a result of the ruling, the Oakland Raiders moved to the Los Angeles Coliseum for the 1982 season.

On April 13, 1983, the jury returned a verdict of about $60 million, including legal fees. That amount was to be paid by the other 27 NFL teams.

The NFL appealed the damages verdict. The litigation, including the award of damages, was disclosed in the financial statement of the Cincinnati Bengals, Inc., for the fiscal year ending February 29, 1984. It contained the following statement:

> The judgment awarded damages to the plaintiffs of approximately $49 million (as trebled), plus interest. In addition, plantiffs can be expected to assert substantial claims for attorneys fees if they are ultimately successful in this litigation. On February 28, 1984, the liability judgement was affirmed by the Court of Appeals. The National Football League and its certain member clubs are in the process of appealing the damages award and intend to continue to defend their position on the liability issues.

4.    1982 NFL Players' Strike

NFL players were on strike from September 20 to November 17, 1982. Nine of the 16 regular games were played. Because of the strike, total attendance was 7,367,438, down 45.9 percent from the 1981 season. Average paid attendance per game played for the 1982 season was 58,472, down 3.7 percent from the 1981 season. The Bengals average paid attendance per game increased from 54,900 for the 1981 season to 57,397 for the 1982 season.

Because seven games were not played, NFL teams lost about $250 million in revenues from radio and television, and from sales of tickets, programs, concessions and parking. For the 1982 season, the Bengals lost $5.3 million in shared television revenues and about $1.8 million in ticket sales. The Bengals had an operating loss of about $1 million and a total loss of about $2.8 million for its fiscal year 1983 (ending February 28, 1983).

5.    The United States Football League

Formation of the United States Football League (USFL) was announced in 1982. The USFL planned to play its games in the spring, not in direct competition with the NFL. However, it intended to compete with the NFL for the admissions and radio revenues in areas where both leagues had teams.

The USFL secured a national TV contract in May 1982 for its spring 1983 season. The USFL formed teams in Birmingham, Chicago, Denver, Detroit, Los Angeles, New Jersey, New Orleans, Oakland, Philadelphia, Phoenix, Tampa, and Washington, D.C. In the spring of 1983, the USFL announced plans to expand to Houston, Jacksonville, Memphis, Tulsa, Pittsburgh, and San Antonio for the 1984 season.

The USFL sought immediately to sign the best college and professional football players available. The USFL's efforts to sign NFL and college players became a concern for the Bengals during the 1982 season. In November 1982, quarterback Jack Thompson, the Bengals' number one draft choice in 1979, refused

to report back to the Bengals after the strike and announced that he would sign with the Michigan Panthers of the USFL. USFL teams were also interested in other Bengals players, such as David Verser, the Bengals' number one draft choice in 1981.

On February 22, 1983, the New Jersey Generals of the USFL announced the signing of 1982 Heisman Trophy winner Herschel Walker. Walker's contract provided for payments of $5 million over 3 years. The USFL held its first college draft on January 4-5, 1983. The USFL drafted several star college players in January 1983; USFL teams tried to sign these players for their spring 1983 season.

E.    1983 Agreements Between Paul Brown and Sawyer

     1.    Background

Sawyer began to have financial difficulties in the early 1980's. Sawyer wanted to receive income from his investment in the Bengals. Sawyer and Paul and Mike Brown began negotiations in the spring of 1981 to increase Sawyer's cash flow from the Bengals.

Paul Brown wanted to give his sons an opportunity to control the Bengals. However, he was concerned about the Bengals' finances and prospects. He knew that Cincinnati was a small market by NFL standards in the early 1980's. In the winter of 1982-83, he thought the USFL, the players' strike that had just ended, the fact that all NFL teams lost money in the 1982 season,

and the Davis liability verdict were harmful to NFL teams, and could be particularly harmful to the Bengals.

By early 1981, the Browns and Sawyer had been business partners in the Bengals and friends for about 15 years. However, they were not related and had never made any significant gifts to each other. The 1983 agreements were negotiated at arm's length between Sawyer on one side and Paul and Mike Brown on the other.

During the negotiations between Sawyer and the Browns, Mike Brown gave Sawyer a projection of Bengals stock dividends for the 8 fiscal years 1984 to 1991 (1983 to 1990 seasons). He projected that Paul Brown's 117 shares and Sawyer's 213 shares (total of 330 shares) would pay dividends totaling $19,935,400 in fiscal years 1983-91 (1982-90 seasons). Sawyer added 2 years to the schedules by assuming that projected dividends for fiscal year 1991 would be repeated in fiscal years 1992 and 1993. Using that assumption, total dividends for fiscal years 1984 to 1993 (1983 to 1992 seasons) for the 330 shares of stock would be $25,004,200.[2]

2.    1983 Stock Purchase Agreement

On March 1, 1983, Sawyer agreed to buy 117 shares of Bengals stock from Paul Brown.[3] Sawyer executed a promissory note

_____

[2] Dividends actually paid for 330 shares of Bengals stock from March 1, 1983, to February 28, 1993, totaled $37,592,909.08.

[3] John Sawyer, Paul Brown, and Mike Brown executed a series of documents, which are dated "March 1, 1983" or "as of March 1,
                                        (continued...)

payable to Paul Brown dated March 1, 1983, in the principal amount of $3.51 million ($30,000 per share), bearing simple interest at 9 percent per annum, with all principal and interest due on February 28, 1993. Sawyer paid no cash for Brown's stock. Sawyer secured the promissory note by pledging to Brown 329 shares of Bengals stock owned by Sawyer (including the 117 shares Sawyer bought from Brown). Assuming no prepayments, Sawyer would owe $6,669,000 to Paul Brown under the note on March 1, 1993. Sawyer and Brown agreed that the transfer would comply with the 1980 voting trust agreement, the 1980 shareholders' agreement, the controlling shareholder S corporation agreement dated May 16, 1983, and the NFL constitution and bylaws. Brown and Sawyer believed that the 1983 agreements met NFL requirements.

### 3. 1983 Stock Option Agreement

Sawyer and Mike and Peter Brown entered into a stock option agreement dated as of March 1, 1983. The stock option agreement provided in part as follows: (a) Sawyer granted to Mike and Peter Brown an irrevocable option to buy up to 329 common shares of Bengals stock owned by Sawyer for $25,000 per share; (b) Mike and Peter Brown could exercise the option from March 1, 1993, to February 28, 1996; (c) if Mike and Peter Brown bought less than

---

[3](...continued)
1983". However, because of the time required to get all of the Bengals shareholders to agree to the S corporation election, the closing of the sale of Paul Brown's Bengals stock was on May 16, 1983.

329 shares, the balance of the shares were released from the option; (d) upon the exercise of the option, Mike and Peter Brown were required to either deliver up to $3 million in cash to an escrow agent plus a promissory note for the balance of any amount due, with interest at 9 percent, or to offset any cash payments with any other amounts which Sawyer may then owe Mike and Peter Brown; (e) the 329 shares (represented by voting trust certificates) were to be deposited with an escrow agent; and (f) Mike and Peter Brown could transfer and assign the option, whether by sale, gift or devise.

Unlike the 1980 option, the 1983 option did not provide for revaluing the stock. Mike and Peter Brown paid Sawyer $1.00 for the option.

The total amount due from March 1, 1993, to February 28, 1996, from Mike and Peter Brown upon the exercise of the option for 329 shares of Bengals stock would be $8,225,000 (329 shares x $25,000 per share). If the Browns exercised the option, Sawyer would get $8,225,000 from the stock sale to the Browns and would owe $6,669,000 on his note to Paul Brown ($3.51 million of principal and $3,159,000 in interest). Thus, Sawyer would receive a net of $1,556,000.

Sawyer hoped that Mike and Peter Brown would not exercise the option to buy the 329 shares. Sawyer did not want to sell, and did not offer to sell, his Bengals stock to Paul Brown. Sawyer wanted to continue to be the Bengals' president and

majority shareholder.  Paul Brown did not offer to buy Sawyer's Bengals stock.

### 4.  1983 Security and Escrow Agreement

Sawyer, and Paul, Mike, and Peter Brown signed a security and escrow agreement around March 1, 1983.  It was accepted on May 16, 1983, by the Central Trust Co. as escrow agent.  This agreement secured Sawyer's payment of the note and performance under the 1983 stock option agreement.  Sawyer gave Paul Brown a security interest in 329 shares of Bengals stock to secure Sawyer's payment of the 1983 promissory note.  Sawyer delivered the voting trust certificates for the 329 shares to the Central Trust Co. as escrow agent.  Sawyer could not sell, pledge, bequeath, or gift his Bengals stock while the security and escrow agreement was in effect.

### 5.  1983 All Shareholders Agreement

An agreement of all Bengals shareholders dated May 16, 1983 (all shareholders agreement), was signed by the Bengals, Sawyer, Paul Brown, David Gamble, Louis Nippert, William and James Williams, and Virginia Fite.  The agreement provided that: (a) By May 15, 1983, each shareholder would execute consents for the Bengals to be taxed as an S corporation; (b) each signatory would not conduct any stock transaction that could cause the Bengals' S corporation election to terminate; (c) the agreement was to continue until the end of the Bengals' taxable year in 1998; and (d) the Bengals agreed, beginning with their fiscal

year 1984, to distribute to each shareholder cash equal to the amount which each shareholder must report as ordinary income on his Federal income tax return for that year because of the Bengals' S corporation election.

6. <u>1983 Controlling Shareholder S Corporation Agreement</u>

The controlling shareholder S corporation agreement, dated May 16, 1983, was signed by the Bengals, Paul Brown, Sawyer, Mike and Peter Brown, and Knowlton. It provided: (a) Each shareholder would execute an S corporation election for the Bengals' tax year beginning March 1, 1983; (b) unless Paul Brown, Knowlton, or Sawyer died, or unless it is necessary to make economically feasible the acquisition of their shares if any of them die, the S corporation election was irrevocable for 10 years, and no shareholder could dispose of the shares in a manner that would disqualify the election for 15 years; (c) the total amount distributed to each shareholder for the year would be not less than the amount which each shareholder must report on his Federal income tax return for that year; and (d) as long as the Bengals were an S corporation, the salaries of Paul, Mike and Peter Brown were limited to the sum of several specified amounts unless otherwise agreed to by Knowlton and Sawyer.

The controlling shareholder S corporation agreement also provided that: (a) Knowlton, Charles D. Lindberg, and Robert Fite were to be members of the Bengals' board of directors as long as Knowlton's stock remained in the voting trust; (b) the

Bengals' board of directors would have at least seven members; and (c) Knowlton would chair the board of directors as long as he owns more than 25 percent of the Bengals' stock.

The all shareholders and the controlling shareholder agreements specified: (a) The disposition of all of the corporation's income (pursuant to the S corporation election); (b) that no more shares of stock would be issued unless approved by two-thirds of the shareholders; (c) the compensation of some directors and the compensation limit of Brown and his sons; (d) that the corporation's code of regulations could not be amended unless approved by two-thirds of the shareholders; (e) the responsibilities of the corporation's general manager and chairman of the board; (f) that the ability of the shareholders to transfer shares (pursuant to the S corporation election) was restricted; (g) that the Bengals could have only one class of stock; and (h) that the corporation would make a tax election to become an S corporation.

7.   Other Facts Related to the 1983 Agreements

Sawyer executed an irrevocable proxy on May 16, 1983. In it, he authorized Paul and Mike Brown to vote his Bengals shares to extend the 1980 voting trust for a second 10-year term and to appoint Peter Brown as successor trustee under the voting trust.

The Bengals filed an S corporation election on May 14, 1983.

On June 14, 1983, Paul, Mike and Peter Brown and Sawyer executed a supplemental voting trust agreement. It named Peter

Brown as the second successor voting trustee. It also stated that, if Peter Brown became the sole voting trustee, the remaining parties would continue to have the voting trust and would deposit their Bengals shares with the second successor voting trustee.[4]

F.    NFL Constitution and Bylaws Relating to a Sale of an
      Interest in an NFL Team

The NFL's constitution and bylaws (as in effect in 1983) required anyone wanting to sell an interest in an NFL team to apply in writing to the NFL Commissioner, and required the Commissioner to submit the application to NFL members for approval. Approval required a vote of three-quarters, or 20, whichever is more, NFL members. Approval was not required for transfers to members of the immediate family of the owner of the interest by gift or upon the death of the owner of the interest.

No written request was submitted to the NFL to approve the 1983 transfer of 117 shares of Bengals stock from Paul Brown to Sawyer. The Bengals informed the NFL sometime before September 1983 that Sawyer had bought Paul Brown's 117 shares. The Commissioner did not ask the other NFL owners to approve the

---

[4] On May 7, 1990, Paul, Mike, and Peter Brown, Sawyer, William J. Williams, Louis Nippert, Harriette Downey, Samuel L. Barr, Jr., West Shell, Jr., and John Downey agreed to irrevocably extend the 1980 voting trust for 10 years. The agreement named Paul Brown voting trustee, Mike Brown successor voting trustee, and Peter Brown second successor voting trustee.

transfer.  The other NFL owners never approved the sale from Brown to Sawyer.

Bill Ray, then the NFL treasurer, prepared a memorandum to the NFL file which showed that on September 29, 1983, the Bengals were owned as follows:

| Name | Shares |
|------|--------|
| John Sawyer | 330 |
| Austin Knowlton | 248 |
| Paul Brown | 1 |
| Mike Brown | 1 |
| Peter Brown | 1 |
| David G. Gamble | 1 |
| Virginia Fite | 1 |
| Louis Nippert | 1 |
| James R. Williams | 1 |
| William J. Williams | 1 |
| Total | 586 |

G.    Brown Family Limited Partnership

1.    Formation, Ownership, and Dissolution of the Brown
      Family Limited Partnership

On August 17, 1983, Paul, Mike, and Peter Brown formed the Brown family limited partnership (Brown family partnership).  The stated value of the capital contribution made by each partner was:

| | Capital Contribution | Units |
|------|------|------|
| **General Partner** | | |
| Paul Brown | $    49,000 | 49 |
| **Limited Partners** | | |
| Paul Brown | $2,300,000 | 2,300 |
| Mike Brown | 500 | .5 |
| Peter Brown | 500 | .5 |

Also on August 17, 1983, Paul, Mike, and Peter Brown took several other actions related to the Brown family partnership. First, Paul Brown assigned the $3.51 million promissory note from Sawyer to the Brown family partnership.[5] Second, Mike and Peter Brown assigned the stock option agreement to the Brown family partnership. Third, Paul Brown gave 375 Brown family partnership units to members of his family as follows:

| Donee | Units |
|-------|-------|
| Mike Brown | 20.00 |
| Peter Brown | 187.50 |
| Nancy Brown (Mike's Wife) | 20.00 |
| Katherine Brown Trust (Mike's Daughter) | 73.75 |
| Paul H. Brown Trust (Mike's Son) | 73.75 |
| Total | 375.00 |

Fourth, Paul Brown sold 1,925 Brown family partnership units to members of his family. Each of those family members gave Paul Brown a promissory note (partnership unit notes), bearing 9-percent interest, for the partnership units they bought from him. All principal and interest was to be due on December 31, 2001. At that time, Paul Brown, if living, would be 93 years old. The

---

[5] Sawyer listed on a balance sheet for 1988 the 1983 promissory note in the amount of $3.51 million as a note due to the Brown family partnership.

partnership unit notes were nonrecourse.  The number of units and amount of each partnership unit note are shown as follows:

|  | Units | Partnership Unit Notes |
|---|---|---|
| Peter Brown | 962.5 | $962,500 |
| Nancy Brown | 117.5 | 117,500 |
| Mike Brown | 117.5 | 117,500 |
| Paul H. Brown Trust | 363.75 | 363,750 |
| Katherine Brown Trust | 363.75 | 363,750 |
| Total | 1,925 | 1,925,000 |

In 1990, Paul Brown gave 9.496 Brown family partnership units to members of his family as follows:

| Donee | Units |
|---|---|
| Nancy Brown | 2.374 |
| Katherine Brown | 1.187 |
| Paul H. Brown | 1.187 |
| Mike Brown | 2.374 |
| Peter Brown | 2.374 |
| Total | 9.496 |

On December 22, 1990, Paul Brown sold his remaining Brown family partnership units as follows:

| Buyer | Purchase Price | Units |
|---|---|---|
| Mike Brown | $146,412.50 | 17.378 |
| Peter Brown | 186,412.50 | 22.126 |
| Total |  | 39.504 |

On December 22, 1990, Paul Brown withdrew as general partner of the Brown family partnership, and Mike Brown, as general partner, executed a certificate canceling the Brown family partnership.  The certificate was filed with the Hamilton County Recorders Office on December 26, 1990.

Sometime from December 22, 1990, to January 2, 1991, Mike and Peter Brown gave Paul Brown promissory notes for $126,412.50 and $166,412.50, respectively, as partial consideration for the Brown family partnership units.  Both notes were paid in full, with interest, in January 1991.

On January 2, 1991, Paul Brown forgave $20,000 of each of the debts incurred by Mike and Peter Brown.

The partnership was later dissolved.  Its assets (the Sawyer note and option) were distributed to the partners, pro rata, according to partnership units held.

2.    Paul Brown's Gifts of Partnership Interests and
      Forgiveness of Related Debt

Paul Brown and his wife, Mary Brown, filed Federal gift tax returns (Forms 709) for the tax years 1983 to 1986, 1990, and 1991.  They used the annual per donee exclusions from gifts (section 2503), and the gift splitting provisions (section 2513) in each of those years, and the unified credit (section 2010) in 1983-86.

On their Forms 709 for 1984, 1985, and 1986, Paul and Mary Brown reported that the donor's adjusted basis was zero for all gifts.

Paul Brown reported making the following gifts in 1983-86 and 1990-91:

Gifts By Paul Brown--1983-86 and 1990-91

Gifts of Partnership Interests, Debt Forgiveness, and Cash

| Donees | Gifts of Partnership Interests | | Gifts of Debt Forgiveness | | | | | Gifts of Cash | |
|---|---|---|---|---|---|---|---|---|---|
| | 1983 | 1990 | 1983 | 1984 | 1985 | 1986 | 1991 | 1990 | 1991 |
| Mike Brown | $20,000 | $20,000 | $11,303.50 | $20,268 | $20,099 | $75,069 | $20,000 | | |
| Peter Brown | 187,500 | 20,000 | 92,592.50 | 166,000 | 164,639 | 615,000 | 20,000 | | |
| Nancy Brown | 20,000 | 20,000 | 11,303.50 | 20,268 | 20,099 | 75,069 | | | |
| Mike Brown, Trustee of the Katherine Brown Trust | 73,750 | | 34,997.75 | 62,732 | 62,221 | 232,431 | | | |
| Mike Brown, Trustee of the Paul H. Brown Trust | 73,750 | | 34,997.75 | 62,732 | 62,221 | 232,431 | | | |
| Grandchildren | | | | | | | | | |
| Katherine Brown | | 10,000 | | | | | | 10,000 | |
| Paul H. Brown | | 10,000 | | | | | | 10,000 | |
| Brian & Donna Brown | | | | | | | | 10,000 | 10,000 |
| Kevin & Linda Brown | | | | | | | | 10,000 | 10,000 |
| Scott & Tanya Brown | | | | | | | | 10,000 | 10,000 |
| Roger & Robin McDougal | | | | | | | | 10,000 | 10,000 |
| Godchild | | | | | | | | | |
| Katie Lietch | | | | | | | | 10,000 | 10,000 |
| Stephanie Fredrich | | | | | | | | | 10,000 |
| Total | 375,000 | 80,000 | 185,195.00 | 332,000 | 329,279 | 1,230,000 | 40,000 | 70,000 | 60,000 |

## 3. Income Tax Returns

Paul Brown reported capital gains income from forgiveness of debt on the sale of Brown family partnership units on his Federal

income tax returns from 1983 to 1986 and 1991 (partial year). He paid tax thereon as follows:

| Year | Capital Gains Income From Forgiveness of Debt | Tax Allocable to Capital Gains Income |
|------|-----------------------------------------------|----------------------------------------|
| 1983 | $185,185 | $37,037 |
| 1984 | 332,000 | 66,400 |
| 1985 | 329,728 | 65,946 |
| 1986 | 1,078,537 | 215,707 |
| 1991 | 330,285 | 94,275 |
| Total | 2,255,735 | 479,365 |

## H. Paul Brown's Will

On October 26, 1990, Paul Brown executed his will. He left any interest he had in the Brown family partnership and any of his shares of the Bengals stock to Mike and Peter Brown. He left to Peter any interest he had in a promissory note from Mike and to Mike any interest he had in a promissory note from Peter. He provided that, if either son died before him, these specific bequests would transfer to his sons' estates.

## I. NFL Approval of the Transfer of Bengals Stock From Sawyer to Brown Family Members

Before October 20, 1992, Mike, Nancy, Peter, and Katherine Brown asked the NFL to approve the transfer of 329 shares of Bengals stock from Sawyer pursuant to the 1983 stock option agreement. The NFL's executive committee and the members of the NFL approved the transfer. By letter dated February 23, 1993, Paul Tagliabue, Commissioner of the NFL, told the Browns and Sawyer that the NFL had approved the transfer.

J.    1993 Escrow Agreement

On February 24, 1993, a 1993 escrow agreement was made by Sawyer, Mike, Nancy, Peter, Katherine, and Paul H. Brown, and PNC Bank as escrow agent.  The escrow agreement provided in part that:  (1) The escrow agent would receive:  (a) voting trust certificates for 329 shares endorsed for transfer by Sawyer; (b) a check for $196,274.32 from Mike Brown, and on or before March 1, 1993, a check for $1,359,725.68, both payable to PNC Bank; and (c) the $3.51 million promissory note from Sawyer to Paul Brown, marked "Paid in Full"; and (2) on March 1, 1993, the escrow agent would release:  (a) the voting trust certificates to the Browns; and (b) a check for $1,556,000 payable to Sawyer and the promissory note.

Paul Brown's sons exercised the option on March 1, 1993. Also on that day, Mike, Peter, and Nancy Brown, Katherine Brown Blackburn, and Paul H. Brown paid Sawyer $1,556,000.

K.    Valuation Issues

For purposes of this case the parties agree and we find that:

1.    On May 16, 1983, the fair market value of a minority interest in the Bengals, after all appropriate discounts, was $28,253 per share.

2.    On May 16, 1983, the fair market value of Sawyer's 1983 promissory note was $2,029,000.

3.   On May 16, 1983, the fair market value of the 1983 option to buy up to 329 shares of Bengals stock from March 1, 1993, to February 28, 1996, was not less than $1.8 million.

4.   When Paul Brown died on August 5, 1991, the fair market value of a majority interest in the Bengals was $111,000 per share and the fair market value of a minority interest was $76,400 per share.  These amounts include all appropriate discounts but do not take into account the effect of the 1983 option on the value of the stock.

OPINION

A.   The Positions of The Parties

Respondent argues that, under section 2036(a), Paul Brown's estate includes 312 shares of Bengals stock.  Respondent contends that the substance of the 1983 transaction is different from its form, and that we should treat it according to its substance.  Respondent contends that the substance of the 1983 transaction is that Paul Brown gave Sawyer the dividends from Paul Brown's 117 shares of Bengals stock for 10 years in exchange for ownership of Sawyer's 212 shares in 10 years.  More specifically, respondent argues that, in substance, the 1983 transaction between Sawyer and Brown was a sale by Sawyer of his 212 shares of Bengals stock (or a remainder interest therein) to Brown in return for a 10-year income interest in Brown's 117 shares of Bengals stock, and an indirect transfer by Brown of 329 shares of Bengals stock to his sons through Sawyer as a conduit.

In light of the fact that five members of Paul Brown's family paid $1,556,000 to Sawyer in 1993, respondent concedes that Sawyer received arm's-length consideration for some of the Bengals stock. Thus, respondent concedes that only 312 shares are included in Paul Brown's estate under section 2036. Our analysis is not affected by whether respondent contends that Brown's estate includes 312 or 329 shares of Bengals stock.

Petitioner contends that Paul Brown's estate does not include any of the 329 shares of Bengals stock sold pursuant to the 1983 agreement between Brown and Sawyer. Petitioner contends that the 1983 agreement was a bona fide, arm's-length agreement, the substance of which is the same as its form. Petitioner contends that section 2036 does not apply to the 117 shares of stock Paul Brown sold to Sawyer because Sawyer paid full consideration for it, or to Sawyer's 212 shares of Bengals stock because Paul Brown did not transfer or retain a life interest in it.

B.   Section 2036 -- Background

A decedent's gross estate includes the value of an interest in property that the decedent transferred for less than adequate and full consideration and in which the decedent retained for life the right to (or to designate a person or persons to) possess or enjoy the income. Sec. 2036(a).[6] Section 2036(a)

-------

[6] Sec. 2036 provides as follows:

(continued...)

applies if: (1) The decedent made an inter vivos transfer of property; (2) the decedent retained the possession or enjoyment of, or the right to the income from, the transferred property, or the right to designate who may use the property or the income therefrom; and (3) the transfer was for less than adequate and full consideration. Sec. 2036(a); National City Bank v. United States, 371 F.2d 13, 15 (6th Cir. 1966). Section 2036(a) applies only if all three of these requirements are met. Sec. 2036(a).

Petitioner bears the burden of proof. Rule 142(a).

As discussed next, we conclude that section 2036 does not apply here because Paul Brown (1) received adequate and full consideration for the 117 shares of Bengals stock, and (2) did

---

[6](...continued)

(a) General rule.-- The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

(b) Voting rights.-- For purposes of subsection (a)(1), the retention of the right to vote (directly or indirectly) shares of stock of a controlled corporation shall be considered to be a retention of the enjoyment of transferred property.

not make an inter vivos transfer of Sawyer's 212 shares of Bengals stock.

C.   Whether Paul Brown Received Adequate and Full Consideration for the 117 Shares of Bengals Stock He Sold to Sawyer

Petitioner contends that Paul Brown transferred the 117 shares to Sawyer for adequate and full consideration.

Receipt of adequate and full consideration in money or money's worth by a transferor removes property from a gross estate.  Sec. 2036(a); Merrill v. Fahs, 324 U.S. 308, 311-312 (1945); Commissioner v. Wemyss, 324 U.S. 303, 307 (1945); Estate of Gregory v. Commissioner, 39 T.C. 1012, 1016 (1963).  Section 2036(a) prevents the depletion of the transferor's gross estate for Federal estate tax purposes where the transferor retains the use and enjoyment of transferred assets until death.  Estate of Frothingham v. Commissioner, 60 T.C. 211, 215-216 (1973).

Respondent argues that Brown's transfer of the 117 shares to Sawyer in 1983 was not for adequate and full consideration.  We disagree.

Brown's sale of the 117 shares of Bengals stock to Sawyer on May 16, 1983, was part of a bona fide, arm's-length agreement. Brown received adequate and full consideration in money or money's worth for the stock.  On May 16, 1983, the 117 shares had a fair market value (as stipulated by the parties) of $3,305,601 ($28,253 per share).  Sawyer paid Brown for the 117 shares (a) by giving him an interest-bearing $3.51 million promissory note, and (b) by granting (at Brown's behest) an option to buy 329 shares

of Bengals stock to Brown's sons for $1.00. The fair market value (as stipulated by the parties) of the promissory note Sawyer transferred to Brown was $2,029,000. The option Sawyer granted to Brown's sons (at Brown's behest) for $1.00 had a fair market value in 1983 (as stipulated by the parties) of at least $1.8 million. Brown received adequate and full consideration for the 117 shares because he transferred 117 shares worth $3.3 million to Sawyer in exchange for property worth at least $3.8 million. Sec. 2036(a). Thus, section 2036(b) does not apply to Brown's 117 shares. Sec. 2036(a); see Hutchens Non-Marital Trust v. Commissioner, T.C. Memo. 1993-600.

Respondent does not contend that Brown received less than adequate and full consideration for Sawyer's 212 shares of Bengals stock. Respondent's silence on the application of one of the elements of section 2036(a) here is consistent with the fact that Brown never owned Sawyer's 212 shares. Thus, one of the three requisites for application of section 2036(a) is not met for both the 117 shares and the 212 shares of Bengals stock.

D. Whether Decedent Made an Inter Vivos Transfer of Sawyer's 212 Shares of Bengals Stock

Respondent argues that Brown transferred the 329 shares of Bengals stock under the interpretation of the term "transfer" in section 2036(a) applied by the U.S. Court of Appeals for the Sixth Circuit. Mahoney v. United States, 831 F.2d 641, 646-647 (6th Cir. 1987); Estate of Shafer v. Commissioner, 749 F.2d 1216, 1221-1222 (6th Cir. 1984), affg. 80 T.C. 1145 (1983). Respondent

points out that section 2036 applies to a remainder interest a decedent buys from a third party if the decedent retained a life interest in the property. Estate of Shafer v. Commissioner, supra.

In Estate of Shafer v. Commissioner, supra, the decedent bought real property and had the seller convey a life interest to him and his wife and a remainder interest to their sons. 749 F.2d at 1218, 1221. The U.S. Court of Appeals for the Sixth Circuit treated the decedent as having (a) purchased the property, (b) transferred the remainder to his sons, and (c) retained a life interest for himself. It held that the decedent's estate included the property under section 2036 because the decedent retained possession and enjoyment of the property while conveying a remainder interest to his sons. Id. at 1221.

Respondent contends that, under Estate of Shafer, section 2036 brings into Paul Brown's estate 312 of the 329 shares obtained by Paul Brown's sons when they exercised the option. We disagree. The decedent in Estate of Shafer bought a life interest and a remainder interest in property. In contrast, Paul Brown did not buy either a life interest or a remainder interest in the 329 shares.

The option granted to the Browns was not a remainder interest. A remainder interest arises automatically when a life interest ends. The Browns were not automatically entitled to

possess the shares on March 1, 1993; they had to exercise the option and pay the option price.

Unlike Estate of Shafer, where the decedent paid for a remainder interest that the seller conveyed to the decedent's sons, Brown did not pay Sawyer for the 212 shares; instead, five members of his family paid $1,556,000 for the shares when Brown's sons exercised the option in 1993.[7]

Paul Brown did not make an inter vivos transfer of Sawyer's 212 shares of Bengals stock. Thus, one of the three requisites for application of section 2036(a) is not met, and section 2036(a) does not apply to those shares.

E.    Whether Paul Brown Retained an Interest in the 329 Shares of Bengals Stock Which Were Subject to the 1983 Agreement

Petitioner contends that the 329 shares of Bengals stock which were subject to the 1983 agreement are not included in Paul Brown's estate under section 2036(a) because Brown did not retain possession or enjoyment of those shares. We need not reach this issue in light of our conclusions that Brown received full and adequate consideration for his 117 shares of Bengals stock and

_____

[7] This case is also distinguishable on other grounds from Estate of Shafer v. Commissioner, 749 F.2d 1216 (6th Cir. 1984), affg. 80 T.C. 1145 (1983). Paul Brown did not acquire the right to vote Sawyer's 212 shares in exchange for the right to receive dividends from Brown's 117 shares of Bengals stock for 10 years; he already had the right to vote Sawyer's 212 shares under the pre-existing all shareholders, controlling shareholder, and voting trust agreements. In contrast, the decedent in Estate of Shafer had no interest of any kind in the property before he bought it from the seller.

that he did not make an inter vivos transfer of Sawyer's 212 shares of Bengals stock.

## F.   Respondent's Substance Over Form Theory

Respondent argues that Paul Brown's estate includes 312 shares of Bengals stock on the grounds that the substance of the 1983 agreement does not comport with its form.

### 1.   Factual Discrepancies Cited by Respondent to Support the Contention that the Form of the Transaction Does Not Comport with Its Substance

Respondent contends that factual discrepancies are present which show that Brown and Sawyer did not respect the form of the transaction.  We disagree that there are any significant discrepancies.

Respondent points out that, despite the fact that the stock purchase agreement, signed on March 1, 1983, required the closing of the sale and purchase to occur immediately after execution of the agreement, the closing was on May 16, 1983.  We do not find the delay to be significant.  Petitioner adequately explained that the parties could not close the transaction until May 16 because of the time required to get the Bengals shareholders to agree to make the S corporation election.

Respondent points out that nearly $66,000 in interest accrued on the promissory note from March 1 to May 16, 1983. Respondent contends that, if Sawyer had expected to pay that interest, he would have delayed the accrual of interest until the transaction closed.  Respondent maintains that Sawyer's failure

to change the 1983 agreement to take the delay into account shows that he knew the option would be exercised and that principal and interest due on the note would be offset by the option price. We disagree. First, we think the parties did not anticipate that there would be a 2-½ month delay in closing the transaction. Second, Sawyer's failure to change the 1983 agreement because of the delay does not show whether he expected the option to be exercised. Assuming that a delay in the accrual of interest would have entitled Sawyer to pay nearly $66,000 less in interest to Brown, and that the option was not exercised, Sawyer would have owed Brown nearly $66,000 less when his note to Brown became due in 1993. By the same token, if the accrual of interest had been delayed and the option was exercised, the $1,556,000 payment to Sawyer from five members of Brown's family would have been nearly $66,000 larger because it was the net of the exercise price and the amount Sawyer owed Brown on the note. Thus, as a result of the failure to delay the accrual of interest, Sawyer would have lost the $66,000 whether or not Brown's sons exercised the option.

Respondent points out that the Bengals did not submit a written request to the NFL to approve Paul Brown's 1983 transfer of 117 shares of Bengals stock to Sawyer, and the other NFL owners did not vote to approve the Brown to Sawyer stock transfer. The Bengals orally notified the NFL that there had been an ownership change. The NFL constitution and bylaws

require the NFL Commissioner (then Pete Rozelle), not the buyer and seller, to present the transaction to the NFL owners for their approval. Rozelle did not submit the transaction to the NFL owners. Brown and Sawyer each believed that the 1983 transaction complied with NFL requirements.

Respondent contends that, despite the 1983 transaction, the NFL and the Bengals shareholders did not recognize Sawyer as the owner of a majority of the Bengals stock. Respondent points out that Sawyer never ran the team, he was not the voting trustee, and he did not terminate the voting trust. We disagree that this shows that Sawyer did not become the majority shareholder in 1983. The NFL knew that Sawyer was the majority shareholder, as shown by the September 29, 1983, NFL memo relating to the Bengals' ownership. Sawyer knew that Paul Brown had the expertise to manage the Bengals. Sawyer reasonably believed that having Paul Brown manage the team helped to protect his investment in the team.

Respondent argues that these facts show that the parties' actions were inconsistent with the form of the transaction. We disagree that these points are significant enough to show that Brown and Sawyer did not respect the form of the transaction.

2. Discussion of Respondent's Substance Over Form Theory

Respondent points out that the Commissioner may look beyond the form of a transaction to see if the form comports with its substance; and, if it does not, the transaction generally may be

taxed according to its substance and not its form. Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Mahoney v. United States, 831 F.2d at 646-647; Patterson v. Commissioner, 810 F.2d 562, 570 (6th Cir. 1987), affg. T.C. Memo. 1985-53; Estate of Shafer v. Commissioner, 749 F.2d at 1221-1222; Schulz v. Commissioner, 294 F.2d 52, 55-56 (9th Cir. 1961), affg. 34 T.C. 235 (1960); 1432 Broadway Corp. v. Commissioner, 160 F.2d 885 (2d Cir. 1947), affg. 4 T.C. 1158 (1945); Lee v. United States, 57 AFTR2d 86-1548, 86-1 USTC par. 13,649 (W.D. Ky. 1985) (substance determines the character of transactions for purposes of section 2036, regardless of the form), affd. without published opinion 815 F.2d 78 (6th Cir. 1987).

Respondent contends that Paul Brown gave the dividends from his 117 shares to Sawyer for 10 years in exchange for an interest or a remainder interest, i.e., the option, in Sawyer's 212 shares of stock and that Brown's interest in the 329 shares of Bengals stock passed from Brown to his children. Respondent asserts that, in substance, Brown bought an interest, e.g., a remainder interest, in Sawyer's 212 shares that passed to Brown's children from Brown. We disagree. The record does not support respondent's view that the transaction was in substance a sale of the stock from Sawyer to Brown in 1983. Brown and Sawyer did not structure the transaction as a sale of stock to Brown in 1983. There is no evidence that Sawyer would have agreed to do so. He

testified that he enjoyed being the majority shareholder of the Bengals.

Respondent contends that the option to buy the 329 shares of Bengals stock covered by the 1983 agreement was a sham, that it was certain that Mike and Peter Brown would exercise it, and that the option is in substance a remainder interest. Respondent points out: (a) Sawyer granted the option, worth at least $1.8 million, to Paul Brown's sons for $1.00; (b) the option price in 1993 ($25,000 per share) was less than the price of the Bengals stock in 1983 ($30,000 per share); and (c) unlike the 1980 stock option between Paul Brown and Sawyer, the 1983 option did not permit the parties to change the option price for the stock each year.

Respondent contends that Paul Brown's sons would not have exercised the option only if the value of the Bengals shares had fallen from the value of one share included in a majority block in 1983 ($46,154 to $51,282 per share)[8] to less than $25,000 per share in 1993 to 1996. Respondent contends that it was even more certain that Paul Brown's sons would exercise the option because the option price was not adjusted for the time value of money.

---

[8] The option price was $25,000 per share for stock which was part of a control block of stock. Sawyer bought 117 shares of Bengals stock from Brown in 1983 for $30,000 per share; the 117 shares were not a control block. Using the $30,000 per share price for a share of stock not owned in a control block, respondent's expert estimated that a share of stock in a control block in 1983 would cost $46,154, and petitioner's expert estimated that it would cost $51,282.

Respondent maintains that the stock could not possibly have lost that much value.

We disagree with respondent's contention that the option was a sham. We rejected a similar contention in Belz Inv. Co. v. Commissioner, 72 T.C. 1209, 1224-1228 (1979), affd. 661 F.2d 76 (6th Cir. 1981), where the Commissioner argued that the taxpayer's exercise of an option was inevitable. The lease granted the taxpayer an option to repurchase a motel after 10 years based on the amount the buyer-lessor paid for the motel, reduced by the excess of rental payments over a specified amount. We concluded that exercise of the option was not inevitable. We noted that the buyer-lessor negotiated the option price at arm's length. Id. at 1226, 1229. Similarly, the option price in the instant case was negotiated at arm's length as part of the 1983 transaction with Sawyer. An option is generally not a sham if purchased as part of an arm's-length transaction. See Cobb v. Commissioner, T.C. Memo. 1985-208.

It was not certain in 1983 that Brown's sons would exercise the option. The parties did not know whether the option price would be less than the value of Bengals stock in 10 years and could not predict events that would occur in those 10 years that would affect the value of the stock. Brown's sons might have decided to exercise the option for less than 329 shares or not at all.

Respondent argues that the option gave Brown's sons a remainder interest in 329 shares of Bengals stock. We disagree. An option to buy property is not an ownership interest in the property. Helvering v. San Joaquin Fruit & Inv. Co., 297 U.S. 496, 498-499 (1936); May v. McGowan, 97 F. Supp. 326, 328-329 (W.D.N.Y. 1950), affd. 194 F.2d 396 (2d Cir. 1952). When Sawyer granted the option to Paul Brown's sons he did not give them an interest or remainder interest in the Bengals stock; he gave them an option to buy stock.

We rejected the Commissioner's argument that an option was an interest in the underlying property in Cobb v. Commissioner, supra. In Cobb, the decedent gave an option to a third party to buy her farm for $100,000 after she died. The farm was worth $270,000 when decedent died. The Commissioner argued that the option agreement was a taxable transfer of the underlying property itself to the third party. We disagreed, and held that the decedent had made no inter vivos transfer of the farm or any interest therein, and that section 2036 did not apply because the decedent received fair consideration for the option. Because Sawyer granted the option to Brown's sons in an arm's-length agreement between Paul Brown and Sawyer, we do not disregard the option.[9]

---

[9] Respondent does not contend, and we need not decide, whether Brown made a constructive gift to his sons in 1983 when Sawyer granted them the option to buy 329 shares of Bengals stock.

G.    Conclusion

For the reasons stated above, we hold that section 2036 does not apply and that one share of Bengals stock is includable in Paul Brown's estate.

To reflect the foregoing,

Decision will be entered for petitioner.